# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Estate of JOHN A. DOYLE.

---

MARIANNE K. DOYLE, Individually and as
Personal Representative of the ESTATE OF JOHN
A. DOYLE,

        Plaintiff-Appellant,

v

COVENANT MEDICAL CENTER, INC.,
MICHIGAN CARDIOVASCULAR INSTITUTE,
P.C., and CHRISTOPHER GENCO, M.D.,

        Defendants-Appellees.

UNPUBLISHED
March 3, 2016

No. 324337
Saginaw Circuit Court
LC No. 12-016476-NH

---

Before: O'CONNELL, P.J., and OWENS and BECKERING, JJ.

PER CURIAM.

      In this medical malpractice action, plaintiff Marianne K. Doyle, individually and as personal representative of the estate of John A. Doyle[1], appeals as of right the trial court's order granting summary disposition pursuant to MCR 2.116(C)(7) in favor of defendants, Covenant Medical Center, Inc. (Covenant), Michigan Cardiovascular Institute, P.C. (MCVI), and Christopher Genco, M.D., on the ground that the complaint was untimely under MCL 600.5838a(2) based on the statute of repose. Plaintiff also challenges the trial court's rulings with regard to the privileged status of a Covenant incident or improvement report and the admissibility of factual statements contained in an offer of settlement letter. We reverse in part, affirm in part, and remand for further proceedings.

---

[1] Mr. Doyle died during the pendency of this appeal.

-1-

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On September 12, 2003, John A. Doyle underwent cardiac bypass surgery at Covenant, performed by Dr. Genco. It is undisputed that Dr. Genco, of MCVI, and his surgical staff left a sponge inside Mr. Doyle's body at the time of the surgery. The sponge measured 4 inches long by 4 inches wide. Being an open-heart cardiac bypass surgery, Mr. Doyle's operating team left the sponge right next to his heart. It is also undisputed that defendants knew that a sponge was missing and could not be found. Per protocol, they counted the number of sponges placed inside Mr. Doyle's body during surgery. There were 40, and the accuracy of this count has never been disputed. Per protocol, they conducted multiple sponge counts in order to ensure that all sponges were removed before completing the surgery. But those counts yielded a return of only 39 sponges. One sponge was missing.

Peter Sulfridge, a circulating nurse at Mr. Doyle's surgery, testified in his deposition that sponge counts are conducted out loud at different intervals during the surgery. The first intraoperative count is done after the patient comes off the bypass pump. The first count in this case was "incorrect," meaning that one sponge was missing. According to Sulfridge, when there is an incorrect count, all sponges are laid out and another count is taken. The entire room is searched, including trash bins, the floor, and the bottoms of shoes. A second count is performed when the surgeon is ready to begin putting in sternal wires. If this count remains incorrect, the surgeon will request an intraoperative x-ray and, if the count remains unresolved, the surgeon will search the operative field for the missing sponge.

Jennifer Cornell, a surgical technician at Mr. Doyle's surgery, and Deborah Tanner, a relief nurse involved in the surgery, testified at deposition that the second count taken in this case was also incorrect, i.e., there was one sponge they still could not find. Tanner and Cornell, along with first assistant surgical technician Julie Weiss, testified that when the sponge counts are incorrect, the surgeon—in this case Dr. Genco—is notified of the discrepancy. According to Tanner, protocol requires an intraoperative x-ray if the second sponge count is incorrect.

Mr. Doyle's medical records indicate that an intraoperative x-ray was ordered. The x-ray image itself was apparently lost and is unavailable, but a written report exists. Dr. Scott Cheney, a radiologist, documented in the report the existence of an "[a]bnormal instrument count, missing sponge during open-heart surgery," but noted that there was "[n]o evidence of [a] retained sponge" on the x-ray. Members of Mr. Doyle's surgical team testified that sponges used in surgery have a radio opaque string woven through each one in order to enable its detection by x-ray. Dr. Genco testified in his deposition that a retained sponge should be detectable in an intraoperative x-ray. However, he also testified that the density of Mr. Doyle's heart and his large physique could have contributed to the inability of the x-ray to detect the missing sponge. Dr. Cheney testified similarly at his deposition, opining that a patient with a large bone structure, when placed in the supine position—the position in which Mr. Doyle would have been—could limit the ability of an x-ray to detect a missing sponge, even though it remains in the patient's body.

Dr. Genco could not specifically recall Mr. Doyle's case. He testified, however, that when there exists the possibility of a retained sponge during an operation, typically an x-ray is

ordered, he conducts "a thorough search of the operative field," and he then reviews the intraoperative x-ray. He believed that in Mr. Doyle's case, he would have looked at the intraoperative x-ray and performed a search of the operative field.

With regard to the standard of care, Dr. Genco testified that it is the surgeon's responsibility to search the operative field for the sponge when there is an inaccurate sponge count. An intraoperative x-ray is also required in a situation where there is an unresolved sponge count. If the x-ray and search of the operative field do not reveal a retained sponge, Dr. Genco testified that it "is the surgeon's obligation to move along" and finish the surgery. Dr. Genco testified that he believes he complied with the applicable standard of care. Although he could not specifically recall Mr. Doyle's case, Dr. Genco testified that "[a]t no point did I believe there was any retained sponge."

It is undisputed that no one informed Mr. Doyle, his family, his primary care doctor, or any other subsequent treating physician about the unresolved sponge count. Dr. Genco's operative report makes no mention of the two inaccurate sponge counts, whether he searched the operative field, that there was an intraoperative x-ray, or that the missing sponge was never found.[2] Further, Dr. Genco's discharge summary does not mention the inaccurate sponge count or the possibility of a retained sponge.

In Mr. Doyle's medical chart at Covenant, a nurse's operative report exists, which notes by way of checkmarks in boxes that two counts revealed an "incorrect" sponge count, and that the issue remained "unresolved" following an intraoperative x-ray. In addition, Dr. Cheney's radiology report reveals the fact that a sponge was missing and not seen on the x-ray. However, neither of these two documents were provided to Mr. Doyle, and they were not sent to his primary care doctor or other treating physicians. None of the documents that were given to Mr. Doyle and his treating physicians after surgery revealed the possibility of a missing sponge or noted the incorrect sponge counts.

According to plaintiff, following the 2003 surgery Mr. Doyle suffered from unexplained shortness of breath, fatigue, sweating, and pain for years, which eluded diagnosis. Plaintiff claims that because defendants did not tell Mr. Doyle or his doctors about the missing sponge, they had no way of suspecting or discovering its presence or understanding why he was suffering from resulting health problems.

On July 6, 2011, Mr. Doyle underwent an echocardiogram, which revealed the presence of a massive left atrial tumor/mass. Mr. Doyle underwent a sternotomy, dissection, and was placed on cardiopulmonary bypass in order to dissect around the inferior aspect of the heart to get at the mass. The surgery was performed by Dr. Genco. The mass turned out to be the

---

[2] Dr. Genco testified that he typically does not note sponge counts—correct or incorrect—in his operative reports. He testified that he had "no reason to discuss or put in a note the possibility that something could have been retained if I felt absolutely that there was no retained sponge."

-3-

missing sponge, which was surrounded by "green foul fluid." The sponge abutted Mr. Doyle's left atrium. It was infected when removed, and Mr. Doyle required further medical care to treat the infection, including home nursing care and the administration of antibiotics through an IV port.

On June 6, 2012, plaintiff filed the present action alleging medical negligence as a result of the retained sponge. Plaintiff alleged that defendants were negligent in a number of ways, including by failing to search the operative field and account for all sponges, failing to remove all sponges utilized in the surgery, and in the face of a missing sponge, failing to inform Mr. Doyle and his treating doctors of the possibility of a retained sponge so they would know in the event complications ensued and doctors could monitor and treat their patient accordingly. Pursuant to MCL 600.2912d, plaintiff filed an affidavit of merit (AOM) from Michael D. Crittenden, M.D., a board-certified thoracic surgeon, supporting plaintiff's claims regarding the standard of care and its alleged breach.

Defendants moved for summary disposition under MCR 2.116(C)(7), asserting that plaintiff's claims were time-barred under MCL 600.5838a(2) because they were not filed within the six-year statute of repose, and that plaintiff failed to sufficiently plead affirmative acts or misrepresentations designed to conceal the existence of a cause of action for purposes of invoking the fraudulent conduct exception set forth in MCL 600.5838a(2)(a). Defendants attached to their motion a copy of Mr. Doyle's medical records, including the nurse's report, which indicated that the sponge count was incorrect and unresolved and that Dr. Genco had been notified, as well as the intraoperative x-ray report, which noted that there was an issue of a potentially missing sponge, but concluded that there was no retained sponge seen. The trial court found that plaintiff had pleaded sufficient factual allegations of fraudulent conduct, but deferred the question of whether plaintiff had factual support for those allegations until the close of discovery and until the court ruled on the discoverability of an incident or improvement report (hereinafter improvement report)—discussed in more detail below—filed by a nurse following the 2003 surgery.

After the close of discovery, and after finding that the improvement report was protected by the peer review privilege, MCL 333.21515 and MCL 333.20175, the trial court granted summary disposition to defendants, finding that MCL 600.5838a(2) barred plaintiff's claims. The court found no evidence of affirmative fraudulent conduct in this case. The trial court recognized that there is an exception to the affirmative-act rule when the defendant has a fiduciary relationship with the plaintiff, wherein there is an affirmative duty to disclose known malpractice, but that plaintiff had not produced evidence to establish that defendants knew they had committed malpractice. The court concluded that "a discrepancy in the [sponge] count does not equate to knowledge of a retained sponge" in light of the search of the surgical field and the radiologist's findings of "no evidence of a retained sponge." The trial court dismissed plaintiff's attendant claim of loss of consortium, concluding that such a claim was derivative of the dismissed medical malpractice claim. The court further held that dismissal of the medical malpractice claim against Dr. Genco also served as a dismissal of any claim against MCVI for Dr. Genco's actions and rendered moot the vicarious liability claims against Covenant.

II. ANALYSIS

On appeal, plaintiff challenges the trial court's rulings that she failed to prove fraudulent concealment for purposes of establishing an exception to the statute of repose, that Covenant's improvement report was not discoverable, and that the facts contained in Covenant's offer of settlement to Mr. Doyle and his wife were not admissible as evidence. We agree in part and disagree in part.

A. MCL 600.5838a(2)

Plaintiff first argues that the trial court erred by granting summary disposition in this medical malpractice action on the ground that the lawsuit was untimely. MCR 2.116(C)(7) permits summary disposition where the claim is barred by the limitations period or the statute of repose. In reviewing a motion under subrule (C)(7), a court accepts as true the plaintiff's well-pleaded allegations of fact, construing them in the plaintiff's favor. *Hanley v Mazda Motor Corp*, 239 Mich App 596, 600; 609 NW2d 203 (2000). The Court must consider affidavits, pleadings, depositions, admissions, and any other documentary evidence submitted by the parties, to determine whether a genuine issue of material fact exists. *Id*. These materials are considered only to the extent that they are admissible in evidence. *In re Miltenberger Estate*, 275 Mich App 47, 51; 737 NW2d 513 (2007). "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court." *Dextrom v Wexford Co*, 287 Mich App 406, 429; 789 NW2d 211 (2010). "However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate." *Id.*

The trial court granted summary disposition to defendants after concluding that plaintiff's claim was barred by MCL 600.5838a(2). The statute provides, in pertinent part:

> Except as otherwise provided in this subsection, an action involving a claim based on medical malpractice may be commenced at any time within the applicable period prescribed in section 5805 or sections 5851 to 5856, or within 6 months after the plaintiff discovers or should have discovered the existence of the claim, whichever is later. However, except as otherwise provided in section 5851(7) or (8), the claim shall not be commenced later than 6 years after the date of the act or omission that is the basis for the claim. The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff. A medical malpractice action that is not commenced within the time prescribed by this subsection is barred. [MCL 600.5838a(2).]

The acts giving rise to plaintiff's claim occurred in 2003. Plaintiff's complaint, filed in June 2012, was well beyond the six-year repose period set forth in MCL 600.5838a(2). Thus, plaintiff had to rely on one of the statutory exceptions. Plaintiff's complaint pled fraudulent conduct on the part of defendants, pursuant to MCL 600.5838a(2)(a), which provides that the statute of repose does not bar a claim

-5-

If discovery of the existence of the claim was prevented by the fraudulent conduct of the health care professional against whom the claim is made or a named employee or agent of the health professional against whom the claim is made, or of the health facility against whom the claim is made or a named employee or agent of a health facility against whom the claim is made.[3]

Thus, the pivotal issue in this case is whether, pursuant to MCL 600.5838a(2)(a), plaintiff was prevented from discovering the existence of the claim by fraudulent conduct. In defining the term "fraudulent conduct" as used in § 5838a(2)(a), this Court in *Sills v Oakland Gen Hosp*, 220 Mich App 303, 309-310; 559 NW2d 348 (1996), looked to caselaw developed under MCL 600.5805:

> This Court has not yet interpreted "fraudulent conduct" as it is used in MCL 600.5838a(2)(a); MSA 27A.5838(1)(2). To define fraudulent conduct, we look to cases involving the limitation period and fraudulent concealment under MCL 600.5855; MSA 27A.5855. Courts consider together statutes that have the same general purpose when ascertaining the intent of the Legislature. *In re Miller Estate*, 359 Mich 167, 172; 101 NW2d 381 (1960). Additionally, statutes that affect similar policies should be interpreted in a like manner. *Swantek v Automobile Club of Mich Ins Group*, 118 Mich App 807, 810; 325 NW2d 588 (1982).

> Under MCL 600.5855; MSA 27A.5855, the statute of limitation is tolled when a party conceals the fact that the plaintiff has a cause of action. *Smith v Sinai Hosp of Detroit*, 152 Mich App 716, 727; 394 NW2d 82 (1986). The plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment. *In re Farris Estate*, 160 Mich App 14, 18; 408 NW2d 92 (1987). The plaintiff must prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery. Mere silence is insufficient. *Buszek v Harper Hosp*, 116 Mich App 650, 654; 323 NW2d 330 (1982). [Footnote omitted.]

We agree with the trial court that plaintiff has not shown affirmative acts or misrepresentations by defendants designed to prevent plaintiff's discovery of a claim. However, that does not end the analysis. As the trial court noted, there is an exception to the affirmative-act rule when the defendant has a fiduciary relationship with the plaintiff. In *Brownell v Garber*, 199 Mich App 519, 527; 503 NW2d 81 (1993) (citations and quotations marks omitted), a case involving legal malpractice, this Court held that an exception to the "affirmative act" rule exists

---

[3] If, as a result of fraudulent conduct, a plaintiff is prevented from discovering the existence of a claim, the plaintiff has additional time, pursuant to MCL 600.5838a(3) to file his or her claim. Here, there is no dispute that, if fraudulent conduct exists, plaintiff's complaint was within the extended time period set forth in MCL 600.5838a(3). The only dispute concerns whether there was fraudulent conduct.

when there is a fiduciary relationship between the plaintiff and the defendant. A fiduciary relationship is often marked by some measure of inequality in the relationship, such as when one places his or her trust in another because of the other's superior knowledge. *In re Estate of Karmey*, 468 Mich 68, 74 n 3; 658 NW2d 796 (2003). In such situation, "there is an affirmative duty to disclose. . . ." *Brownell*, 199 Mich App at 527. See also *Dillard v Schlussel*, 308 Mich App 429, 443; 865 NW2d 648 (2014) ("Absent a fiduciary relationship, fraudulent concealment extends the applicable limitations period only when the defendant has made an affirmative act or representation."). The existence of fraudulent concealment in such circumstances can be shown when plaintiff alleges facts that indicate defendant did so (failed to disclose) intentionally so as to mislead plaintiff, *Brownell*, 199 Mich App at 531, which would allow the period of limitations to potentially expire before plaintiff realized he or she had a claim.

Our courts have recognized a physician/patient relationship as a fiduciary relationship. *Eschenbacher v Hier*, 363 Mich 676, 679-680; 110 NW2d 731 (1961); *Melynchenko v Clay*, 152 Mich App 193, 197; 393 NW2d 589 (1986); *Portage Aluminum Co v Kentwood Nat'l Bank*, 106 Mich App 290, 294; 307 NW2d 761 (1981). We agree with the above-cited authorities that such a relationship exists in the context of a physician and a patient. See *Eschenbacher*, 363 Mich at 680. "When a fiduciary relationship exists, the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *The Meyer & Anna Prentis Family Foundation v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 43; 698 NW2d 900 (2005).

While there was a fiduciary relationship between Mr. Doyle and Dr. Genco, the issue remains: what must the fiduciary refrain from disclosing in order for the plaintiff to show fraudulent conduct that will postpone the running of a limitations period?

As an initial matter, it is clear that the fiduciary must have knowledge of that which was not disclosed. See *Brownell*, 199 Mich App at 528-529 (explaining that a fiduciary does not have a duty to disclose malpractice of which he was unaware). The trial court held that a fiduciary has a duty to disclose known *malpractice* and, because Dr. Genco claims he did not know he committed malpractice in this case, there was no duty to disclose; hence, plaintiff could not plead a lack of disclosure that would extend the statute in this case.

We do not agree with the trial court's interpretation and application of the fraudulent conduct exception in this case. Although a fiduciary cannot be expected to disclose information about which he or she is unaware (e.g. inadvertently perforating a nearby organ without realizing it) or to disclose a breach when he or she failed to appreciate that his or her conduct breached the standard of care (e.g. misdiagnosing a patient's presenting condition), a fiduciary cannot shirk his or her duty to disclose by pleading ignorance to the fact that it was malpractice despite knowing what happened (e.g. realizing that a nearby organ was inadvertently perforated but claiming not to realize it was malpractice, and thus, not telling the patient, or realizing the patient's condition was wrongly diagnosed but claiming such misdiagnosis was not malpractice, and thus, not telling the patient). Allowing a defendant to plead ignorance in the presence of known and undisputed facts that implicate malpractice would promote self-serving defenses that would thwart the viability of the fraudulent concealment exception in fiduciary matters.

-7-

Consistent with the purpose of the fraudulent-concealment exception to MCL 600.5838a, the intentional failure to disclose known, pertinent information, in order to deprive plaintiff of the ability to realize that he or she has a potential cause of action constitutes fraudulent concealment. See *Dillard*, 308 Mich App at 443. See also *The Reserve at Heritage Village Ass'n v Warren Fin Acquisition, LLC*, 305 Mich App 92, 122; 850 NW2d 649 (2014) ("Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder *acquirement of information disclosing a right of action*.") (citation and quotation omitted; emphasis added). Fraudulent conduct refers to acts taken—or in the case of an affirmative duty to disclose, the intentional failure to act—so as to prevent the plaintiff from discovering the existence of a possible cause of action. The trial court's narrow reading of *Brownell*—which defendants urge us to adopt—is inconsistent with the purpose of the fraudulent conduct exception set forth in MCL 600.5838a.

In the case at bar, the failure to disclose the clearly known fact that there was a missing sponge not only deprived Mr. Doyle of an opportunity to timely treat ensuing complications in the event the sponge was left in his body—and it was—it deprived plaintiff of knowledge of the facts underlying the claim for malpractice, i.e., it deprived plaintiff of the ability to discover the existence of a potential cause of action. Although Dr. Genco contends he reasonably concluded that the sponge was not inside Mr. Doyle's body, and thus, no further action or discussion was required, he admittedly knew that its whereabouts were never determined and the intraoperative x-ray was not dispositive. That the sponge was not found is undisputed and is of paramount importance to this case. It is axiomatic that the sponge did not spontaneously combust or crawl away on its own. Within the four walls of the operating suite, the sponge had to be somewhere.[4] Thus, there existed an undeniable possibility that the sponge was still inside Mr. Doyle—near his heart, the situs of the operation—following his bypass surgery. According to the evidence gleaned during discovery, it was undisputed that Dr. Genco knew[5] about the missing sponge and chose not to document anything about it in Mr. Doyle's medical records, not to discuss it with Mr. Doyle or his family, and not to tell Mr. Doyle's primary care doctor or any subsequent treating physicians. Although the sponge could hypothetically have been somewhere else in the operating suite, we find that there is enough evidence to conclude that Dr. Genco owed Mr. Doyle a fiduciary duty to disclose the fact that there was a missing sponge, and the intentional failure to do so constitutes fraudulent concealment under the circumstances presented. Knowing about the missing sponge, regardless of its whereabouts, would have put Mr. Doyle—and, by extension, plaintiff—on notice of a potential cause of action, wherein the burden was on plaintiff

---

[4] Again, defendants do not take issue with the fact that 40 sponges were placed in Mr. Doyle's body and only 39 were found.

[5] All of the evidence presented reveals that Dr. Genco was informed that the sponge could not be accounted for despite several attempts to locate it. Dr. Genco testified that he would have been involved in the process of ordering the x-ray to look for the missing sponge, and he would have been involved in any search of the operative site.

to further investigate and pursue a claim should he find one to exist.[6]  Because Dr. Genco did not tell Mr. Doyle what happened in that operating room, his silence is what allowed a sponge to remain inside Mr. Doyle's body for eight years and it is the very reason Mr. Doyle was not able to timely file his malpractice action.  Under the circumstances, it was incumbent upon the fiduciary, Dr. Genco, to disclose the problem that arose during surgery to Mr. Doyle in the face of the known risk that the sponge could in fact still be inside his body.[7]

In light of the undisputed facts, we find that plaintiff established a failure to disclose on the part of Dr. Genco that amounted to fraudulent conduct, which was sufficient to invoke the exception found in MCL 600.5838a(2)(a).[8]

---

[6] "[T]he standard under the discovery rule is not that the plaintiff knows of a 'likely' cause of action.  Instead, a plaintiff need only discover that he has a 'possible' cause of action." *Gebhardt v O'Rourke*, 444 Mich 535, 544; 510 NW2d 900 (1994).  Plaintiff did not need to know the full extent of his damages, *Seebacher v Fitzgerald, Hodgman, Cawthorne & King, PC*, 181 Mich App 642, 647; 449 NW2d 673 (1989).

[7] Contrary to the argument made by the dissent, plaintiff is not required to provide direct proof that Dr. Genco knew he had committed malpractice—extracting that evidence would necessarily require a confession or a witness to a confession.  Such a requirement would make a mockery of the fiduciary duty law and place the keys to the outcome in the hands of a defendant.  Rather, the plaintiff must prove that Dr. Genco knew certain facts, and that his knowledge of those facts gave rise to a fiduciary duty to disclose them to Mr. Doyle as they pertained to a potential cause of action.  Given plaintiff's production of undisputed evidence that Dr. Genco knew the sponge was still missing and was not found—despite search efforts—anywhere within the four walls of the operating suite, it was undeniable, as Dr. Genco conceded, that the sponge could still be in Mr. Doyle's body, even though Dr. Genco proclaims that he did not think it actually was.  We find that the known, undisputed facts gave rise to an affirmative duty to disclose the situation to Mr. Doyle, who was entirely reliant upon and necessarily trusted Dr. Genco to share all pertinent information with him, and that Dr. Genco's knowing decision not to do so constituted fraudulent concealment.

[8] We are careful to point out that whether Dr. Genco had a duty to disclose, as part of his fiduciary relationship with Mr. Doyle, is distinct from the question of whether malpractice occurred.  The duty to disclose involves a fiduciary's duty to disclose a potential cause of action.  Here, the possibility of a 4-inch by 4-inch sponge near Mr. Doyle's heart should have given him knowledge that he had a potential cause of action against defendants.  Whether leaving the sponge in his body or the failing to disclose that there was a missing sponge amounted to malpractice, on the other hand, requires evaluation of the standard of care and whether, under the circumstances, Dr. Genco breached that standard of care.  In other words, whether malpractice occurred involves the issue of whether the failure to disclose the incorrect sponge count, in light of the subsequent actions taken, violated the standard of care.  That is a question to be resolved on remand.

B.  THE IMPROVEMENT REPORT

Because we are remanding for further proceedings, we address the remainder of plaintiff's issues raised on appeal.  The first such issue concerns the improvement report.  During his deposition testimony, Sulfridge testified that he prepared the improvement report and gave it to his supervisor, and that this was the standard procedure when there is a possibility of a retained instrument during surgery.  Plaintiff sought production of the report.  Covenant refused to produce the report, arguing that the document was subject to the peer review privilege under MCL 333.21515 and MCL 333.20175.  Plaintiff claimed that the report was not prepared for peer review purposes.  Following a hearing at which Rebecca Schultz, Covenant's Director of Risk Management, testified, the trial court found that the improvement report was protected by the statutory peer review privilege.  Although a trial court's order regarding discovery is ordinarily reviewed for an abuse of discretion, whether production of evidence is barred by a statute is a question of law and is therefore reviewed de novo. *Ligouri v Wyandotte Hosp & Med Ctr*, 253 Mich App 372, 375; 655 NW2d 592 (2002).  Application of the peer review privilege is an issue of law reviewed de novo. *Dye v St John Hosp & Med Ctr*, 230 Mich App 661, 665-666; 584 NW2d 747 (1998).

Under the Public Health Code, "hospitals are required to review their professional practices and procedures to improve the quality of patient care and reduce morbidity and mortality." *Gallagher v Detroit-Macomb Hosp Ass'n*, 171 Mich App 761, 768; 431 NW2d 90 (1988).  Therefore, "[t]o encourage and implement productive peer review procedures, the Legislature had provided that the information and records developed and compiled by peer review committees be confidential and not subject to court subpoena." *Attorney General v Bruce*, 422 Mich 157, 161; 369 NW2d 826 (1985).  Specifically, two statutes govern the confidentiality of records, reports, and other information collected or used by peer review committees in furtherance of their duties.  MCL 333.20175(8) provides:

> The records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine, are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena.

And, MCL 333.21515 provides:

> The records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena.

The privilege may only be invoked for records, data, and knowledge collected for or by an individual or committee assigned a review function. *Marchand v Henry Ford Hosp*, 398 Mich 163, 167; 247 NW2d 280 (1976).  In determining whether the information or record is privileged, the court should consider the hospital's bylaws, internal rules and regulations and whether the committee's function is that of retrospective review for purposes of improvement

and self-analysis and thereby protected, or part of current patient care. *Monty v Warren Hosp Corp*, 422 Mich 138, 147; 366 NW2d 198 (1985).

In *Dorris v Detroit Osteopathic Hosp*, 460 Mich 26, 28-29; 594 NW2d 455 (1999), the Court reviewed the trial court's order that the defendant hospital provide the plaintiff with any investigative reports relative to an incident involving the assault and battery of the plaintiff while she was a patient at the defendant hospital, any statements made by any person with respect to the incident, and any notes, memoranda, records, and reports related to the incident. After a discussion of *Gallagher*, 171 Mich App 761, and *Monty*, 422 Mich 138, the Court noted with respect to incident reports the following:

> Hospital personnel are expected to give their honest assessment and reviews of the performance of other hospital staff in incidents such as the one in the present case. Absent the assurance of confidentiality provided by §§ 21515 and 20175(8), the willingness of hospital staff to provide their candid assessment will be greatly diminished. This will have a direct effect on the hospital's ability to monitor, investigate, and respond to trends and incidents that affects patient care, morbidity, and mortality. [*Dorris*, 460 Mich at 42.]

*Dorris* held, however, that a plaintiff must be afforded the opportunity to challenge a defendant's evidence and assertion that the information sought was collected for a privileged purpose. *Id*. at 43.

The trial court afforded plaintiff the opportunity for an evidentiary hearing to test Covenant's claim of peer review privilege. At the hearing, Schultz produced Covenant's "Incident and Improvement Reporting" policy, which identified the objective of the policy as: "To report all incidents and opportunities for improvement within Covenant HealthCare System. These reports will be tracked and trended for the purposes of developing safety prevention, loss control and peer review programs which will benefit all patients and users of Covenant HealthCare System's facilities and services." The policy provides that "[i]nformation about the incident will be completely documented on the approved Improvement Report Form." The policy further provides that "[t]he information documented in the Improvement Report Form or collected during the investigation of the incident is protected by Michigan Peer Review Statutes." Schultz's testimony revealed that Covenant's policy requires staff to fill out a report if an incident occurs,[9] and the report is forwarded to the employee's manager for an assessment and determination of whether improvement measures should be taken. Depending on the situation, further action for patient safety or process improvement measures may be recommended. The report is then forwarded on to the risk management department, where a staff member will determine whether any further action need be taken.

---

[9] Schultz testified that the reporting policy was substantially the same as that which existed in 2003.

As in *Gallagher*, 171 Mich App 761, where this Court found an incident report prepared regarding the plaintiff's slip and fall while a patient at South Macomb Hospital privileged, the improvement report here is completed for unusual incidents, is done to assist in improving the hospital's facilities and services, and is initially routed to a supervisor for review. Like the report in *Gallagher*, which would then ultimately be forwarded to that hospital's legal affairs department, the reports here are then routed by the supervisor to risk management for additional review. The information in the report is similarly tabulated to identify trends and routed to various quality committees. We conclude that the incident and improvement policy fulfills the protected review functions and that the improvement report was privileged as a peer review record.

To the extent that plaintiff argues that the objective facts within the improvement report are discoverable, this argument is without merit in light of *Krusac v Covenant Med Ctr, Inc*, 497 Mich 251, 253, 259; 865 NW2d 908 (2015), wherein the Court held that §§ 20175(8) and 21515 do not contain an exception to the peer review privilege for objective facts.

## C. OFFER OF SETTLEMENT

Plaintiff next asserts as error the trial court's decision on Covenant's motion to exclude a 2011 letter from Schultz to Mr. Doyle regarding an alleged settlement proposal. In the letter, Schultz stated the following:

> I hope this letter finds you at home recovering well from your recent surgery. It was a pleasure to meet with you at St. Mary's Hospital and then again with you and your wife at Covenant Transitional Care Unit; I only wish it could have been under different circumstances. The purpose of this letter is to briefly outline in writing what we discussed.

> I informed you that I reviewed your medical record from your September 2003 open heart surgery at Covenant HealthCare. It revealed that at the end of your surgery the sponge count was incorrect, the surgeon was made aware and x-rays were taken to determine if the missing sponge was retained. Unfortunately, the x-ray did not verify the sponge that we now know was left in the operative area. Based upon the negative x-ray findings, the surgeon made the decision not to re-open your chest to look for the missing sponge.

> I shared with you that I contacted St. Mary's, Mobile Medical Response (MMR), Covenant HealthCare Transitional Care Unit, and the Visiting Nurses Association to inform them that all bills for the care and treatment you have received and continue to receive associated with the retained sponge should be sent directly to my attention at Covenant HealthCare for payment and not your insurance carriers. If by chance you receive any bills related to this care, please do not pay them, forward them to my attention.

> I also informed you that I would reimburse you for Maryann's [sic] travel expenses back and forth to see you during your hospitalization. Kindly submit a list of dates and I will have a check sent to you upon receipt.

Maryann [sic] stated that she was disappointed with Covenant because no one from Covenant had contacted either of you. Therefore, she sought the advice of legal counsel. As you will recall, my response to her concerns was that of surprise because I had been in contact with both of you. As the Covenant HealthCare representative, I helped facilitate your transfer and admission to Covenant HealthCare TCU, which included the transportation to TCU from St. Mary's for both of you. When you decided you wanted to be at home, I helped to facilitate the home care arrangements with VNA to provide you the care and treatment necessary as well as transportation home via MMR. I had also shared with you in person and on the phone that Covenant HealthCare would be responsible for all costs associated with this incident. Nonetheless, although I know we could have reached some resolution without attorneys, I respect your decision to retain legal counsel and would be more than happy to work with your attorney if need be.

I can only begin to imagine what you and Mary Ann [sic] have gone through because of the retained sponge. Words cannot express how extremely sorry I am for all the additional pain, suffering, and medical care and treatment you have had to experience. I wish I could go back in time and change the events that occurred during your September 2003 surgery; regrettably that is not possible and all I can do is take care of the costs associated with your most recent hospitalization and recovery. When you have recovered, I will work with you (or your attorney if you choose) to fairly compensate you for what you have experienced. . . .

Defendants asserted below that this letter constituted an offer to compromise that was inadmissible to prove liability for the claim under MRE 408 and MRE 409. MRE 408 provides, in pertinent part:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

The rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." MRE 408.

MRE 409 provides, "Evidence of furnishing or offering or promising to pay medical, hospital, or similar expenses occasioned by an injury is not admissible to prove liability for the injury." The rule requires exclusion of evidence of compromise particularly because "settlements may be motivated by a great many possible considerations unrelated to the

substantive merits of a claim." *Chouman v Home Owners Ins Co*, 293 Mich App 434, 438; 810 NW2d 88 (2011).

The trial court granted defendants' motion in limine to exclude the letter. Plaintiff does not dispute that the offer to pay medical expenses or to compromise the claim as set forth in the letter may be excluded under MRE 408 and 409. Rather, plaintiff argues that certain factual statements within the letter are admissible under MRE 801(d)(2) as the admissions of a party opponent. Specifically, plaintiff argues that Schultz's statement, "Based upon the negative x-ray findings, the surgeon made the decision not to re-open your chest to look for the missing sponge," is admissible as an admission of a party opponent because Schultz is an agent of Covenant. We disagree with plaintiff's position. The crux of plaintiff's argument shows that plaintiff wishes to use the statement to demonstrate that Dr. Genco closed Mr. Doyle's chest cavity before looking for the missing sponge. This is an attempt to use the statement to establish liability, i.e., showing that Dr. Genco did not search the operative field for the sponge and was negligent for failing to do so, and is prohibited by MRE 408. The trial court's exclusion of this letter—including the statements plaintiff wishes to pluck from the letter—was not an abuse of discretion.[10]

## V. CONCLUSION

Because we find that the trial court erred when it granted summary disposition to defendants pursuant to MCR 2.116(C)(7), we reverse the grant of summary disposition and remand for further proceedings consistent with this opinion. In regard to the trial court's rulings on the production of the improvement report and on the motion to exclude Schultz's letter to Mr. Doyle, we affirm the trial court.

Reversed in part, affirmed in part, and remanded for further proceedings. We do not retain jurisdiction.

/s/ Donald S. Owens
/s/ Jane M. Beckering

---

[10] We note, however, that MRE 408 "does not require the exclusion of any evidence *otherwise discoverable* merely because it was presented in the course of compromise negotiations." (Emphasis added). As such, plaintiff was free pursue the source of Schultz's factual information and submit that evidence in an admissible form with a proper foundation.

-14-